IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:13-CV-9-FL

| | |
|---|---|
| ANTONIO R. HAMMONDS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **MEMORANDUM &** |
| ) | **RECOMMENDATION** |
| CAROLYN W. COLVIN, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

This matter is before the court on the parties' cross motions for judgment on the pleadings [DE #24 & 28] pursuant to Rule 12 of the Federal Rules of Civil Procedure. Plaintiff Antonio R. Hammonds ("Claimant") filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial review of the denial of his application for Supplemental Security Income ("SSI") payments. The parties have filed memoranda in support of their respective motions, and the time for filing responsive briefs has expired. Accordingly, the pending motions are ripe for adjudication. Having carefully reviewed the administrative record and the motions and memoranda submitted by the parties, the undersigned recommends denying Claimant's Motion for Judgment on the Pleadings, granting Defendant's Motion for Judgment on the Pleadings and upholding the final decision of the Commissioner.

## STATEMENT OF THE CASE

Claimant protectively filed an application for SSI on October 28, 2009, alleging disability beginning October 1, 2006. (R. 9, 91–94, 98–99.) His claim was denied initially and upon reconsideration. (R. 85–86.) A hearing before Administrative Law Judge Christopher Willis ("ALJ") was held on July 7, 2011, at which Claimant was represented by counsel. (R. 21.)

Kathleen Robbins, an impartial vocational expert ("VE") appeared and testified. (R. 68–80.) On November 23, 2011, the ALJ issued a decision denying Claimant's request for benefits. (R. 9–18.) On November 14, 2012, the Appeals Council denied Claimant's request for review. (R. 1–5.) Claimant then filed a complaint in this court seeking review of the now final administrative decision.

## STANDARD OF REVIEW

The scope of judicial review of a final agency decision regarding disability benefits under the Social Security Act, 42 U.S.C. §§ 301 *et seq.*, ("Act") is limited to determining whether substantial evidence supports the Commissioner's factual findings and whether the decision was reached through the application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g) (2012). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). While substantial evidence is not a "large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988), it is "more than a mere scintilla . . . and somewhat less than a preponderance," *Laws*, 368 F.2d at 642. "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (alterations in original). Rather, in conducting the "substantial evidence" inquiry, the court's review is limited to whether the ALJ analyzed the relevant evidence and sufficiently explained his or her findings and rationale in crediting the evidence. *Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439–40 (4th Cir. 1997).

2

# DISABILITY EVALUATION PROCESS

The disability determination is based on a five-step, sequential evaluation process as set forth in 20 C.F.R. § 416.920 under which the ALJ is to evaluate a claim:

> The claimant (1) must not be engaged in "substantial gainful activity," i.e., currently working; and (2) must have a "severe" impairment that (3) meets or exceeds [in severity] the "listings" of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform . . . past work or (5) any other work.

*Albright v. Comm'r of the Soc. Sec. Admin.*, 174 F.3d 473, 474 n.2 (4th Cir. 1999). "If an applicant's claim fails at any step of the process, the ALJ need not advance to the subsequent steps." *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995). The burden of proof and production during the first four steps of the inquiry rests on the claimant. *Id*. At the fifth step, the burden shifts to the Commissioner to show that other work exists in the national economy which the claimant can perform. *Id*.

When assessing the severity of mental impairments, the ALJ must do so in accordance with the "special technique" described in 20 C.F.R. § 416.920a(b)–(c) (2013). This regulatory scheme identifies four broad functional areas in which the ALJ rates the degree of functional limitation resulting from a claimant's mental impairment(s): activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. § 416.920a(c)(3). The ALJ is required to incorporate into his written decision pertinent findings and conclusions based on the "special technique." 20 C.F.R. § 416.920a(e)(3).

In this case, Claimant alleges that the ALJ erred by improperly evaluating Claimant's credibility and residual functional capacity ("RFC"). (Pl.'s Mem. Supp. Mot. J. Pleadings [DE #25] at 1.) Claimant specifically argues that his testimony concerning his symptoms was

3

supported by the record and that the ALJ erred by failing to consider evidence of a neuropsychological evaluation conducted by Dr. Karla Thompson. (Pl.'s Mem. at 10–12.)

## FACTUAL HISTORY

### I. ALJ's Findings

Applying the above-described five-step, sequential evaluation process, the ALJ found Claimant "not disabled" as defined in the Act. At step one, the ALJ found Claimant had not engaged in substantial gainful employment. (R. 11.) Next, the ALJ determined Claimant had the following severe impairments: "left shoulder instability, residual symptoms of traumatic brain injury (TBI), left eye blindness, a seizure disorder, history attention deficit-hyperactivity disorder (ADHD), depression, a learning disorder, intermittent explosive disorder, a personality disorder and poly-substance abuse." (*Id.*) The ALJ also found Claimant had a non-severe impairment of Wolff-Parkinson-White syndrome. (R. 12.) However, at step three, the ALJ concluded these impairments were not severe enough, either individually or in combination, to meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 12–13.) Applying the technique prescribed by the regulations, the ALJ found that Claimant's mental impairments have resulted in moderate limitations in his activities of daily living, social functioning, and concentration, persistence, and pace with no episodes of decompensation. (R. 12.)

Prior to proceeding to step four, the ALJ assessed Claimant's residual functional capacity, finding Claimant had the ability to perform a full range of work at all exertional levels subject to the following non-exertional limitations: (1) left eye blindness, (2) no "overhead work with his left (dominant) upper extremity;" (3) no climbing of ladders, ropes or scaffolds; (4) "only occasional balancing;" (5) "avoid all exposure to hazards, such as dangerous moving machinery and

4

unprotected heights;" and (6) only "simple, routine, repetitive tasks at a non-production pace in a low-stress work setting requiring minimal social contact." The ALJ further clarified that Claimant could "understand and remember simple instructions, [was] capable of carrying out short and simple instructions, ha[d] the ability to maintain attention and concentration for 2 hours at a time, as required for the completion of simple tasks, [could] adapt to minor changes associated with the performance of simple tasks, [and could] function adequately in a stable work setting that is not highly production oriented or socially demanding."  (R. 13.)  In making this assessment, the ALJ found Claimant's statements about his limitations not credible to the extent they were inconsistent with the RFC.  (R. 14.)

At step four, the ALJ concluded Claimant had no past relevant work.  (R. 17.)  At step five, upon considering Claimant's age, education, work experience, and RFC, the ALJ determined Claimant is capable of adjusting to the demands of employment opportunities that exist in significant numbers in the national and state economies.  (R. 17–18.)

## II. Claimant's Testimony

At the time of Claimant's administrative hearing, Claimant was 20 years old, had completed the ninth grade, and was unemployed.  (R. 27–28.)  Claimant has no employment history.  (R. 28.)

Claimant explained numerous medical conditions supporting his disability claim and his inability to work full-time.  Claimant complained that he suffered from seizures resulting from traumatic brain injury, Wolff-Parkinson-White syndrome, left shoulder dislocations, and headaches.  (R. 31–32, 41–42, 44–45.)  Claimant currently lives with his grandmother and previously lived with his aunt and uncle.  (R. 53.)  Claimant does not drive and relies on others for transportation.  (R. 29, 61, 65–66.)  Claimant stated he spoke with a doctor about going back

5

to school to get his GED, but he did not start the program because he had no transportation. (R. 29.) Claimant reported he attended one session of vocational therapy but never received a call back after an employment referral, so he did not return. (R. 29, 54.)

In October 2006, Claimant suffered an assault and was hit in the head with a baseball bat. (R. 30.) As a result, Claimant had brain surgery and lost sight in his left eye due to damage to the optic nerve. (*Id.*) Upon returning to school, Claimant testified that he would become angry and get an attitude with teachers, where before this had not occurred. (R. 52.) Claimant was expelled from school for possession of marijuana. (R. 27–28.)

Claimant stated that in early 2007 he began having seizures. (R. 31.) Claimant was prescribed Zonizamade and Carbatrol for his seizures, and as long as Claimant remembers to take his medication consistently, his seizures are well controlled. (R. 32, 37.) Claimant reported that all of his seizures have occurred when he was sleeping, and at the time of the hearing, he had not suffered a seizure in the past year. (R. 37, 40.) Claimant testified that he often has headaches, but that these may be a side effect of his seizure medication, and they are well controlled with Tylenol and Ibuprofen. (R. 41–42, 55.) Another result of Claimant's seizures is that his shoulder becomes dislocated during the seizure. (R. 44.) Because of frequent dislocation, Claimant stated that his shoulder will "jump" out of socket and "pops" with movement. (R. 45.)

Claimant has also been diagnosed with Wolff-Parkinson-White syndrome. (R. 32.) This makes his heart beat "out of line," and he will get dizzy and pass out if he gets up too quickly. (R. 32.) Claimant takes Atenolol for his symptoms, and Claimant stated this syndrome was "basically under control." (R. 32, 51.)

Claimant has an extensive history of using marijuana. (R. 33.) Claimant testified that he uses marijuana three to four times every two to three weeks. (*Id.*) Claimant stated he uses in

6

order to deal with depressive feelings associated with his traumatic brain injury. (R. 34–35.) Claimant was prescribed medication for his depression but stopped taking them after a short period of time. (R. 36.)

Claimant testified that his typical daily activities include sitting around the house, drawing, and playing video games. (R. 47, 48, 56.) Claimant reported that he can concentrate when drawing because he does not want to "mess up." (R. 57.) Claimant also stated he takes care of his personal hygiene, such as showering and brushing his teeth. (R. 58.) When asked why he could not work, Claimant responded that he "wouldn't mind working," but he gets tired faster, has trouble concentrating, and he is forgetful. (R. 50.)

### III. Vocational Expert's Testimony

Dr. Kathleen Robbins testified as a VE at the administrative hearing. (R. 68–80.) Claimant had no past work experience for which the VE could provide testimony (R. 68), so the ALJ posed the following hypothetical question:

> And I want you to assume a hypothetical of the claimant's age, education, and work experience – or lack of work experience. The hypothetical individual is blind in the left eye, has no visual field. The hypothetical individual would have to – I'll say just no ladders, ropes, scaffolds, – no climbing ladders, ropes, scaffolds; and occasional balancing. The individual would further need to avoid – I'll say avoid all exposure to hazards, so avoid hazards altogether such as dangerous moving machinery and unprotected heights. . . . [T]he hypothetical individual would be limited to simple, routine, repetitive tasks in a low-stress, low-social-demand work setting, non-production pace. . . .
>
> . . . .
>
> . . . [T]he hypothetical individual is left-hand dominant, so no overhead work with the left upper extremity. . . . [F]urther define [the mental limitations] to say the hypothetical individual can understand and remember simple instructions, is capable of carrying out short and simple instructions, and has the ability to maintain attention and concentration for two hours at a time as required for completion of simple tasks; should be able to adapt to minor changes associated with performance of simple tasks and function adequately in a stable work setting

7

in a position that's not highly production-oriented or socially demanding. . . . So is the hypothetical I've given you sufficient for you to give me an opinion as to whether or not there would be jobs in the economy that would fit or be available for such an individual?

(R. 68–71.) The VE responded in the affirmative and provided the following positions: surveillance system monitor (sedentary work, unskilled, DOT 379.367-010) and office helper (light work, unskilled, DOT 239.567-010). (R. 72–75.) The VE provided further testimony that, though the office helper position was within the category of light work, based on her training and experience, there were sedentary positions available within the numbers she cited. (R. 75.) The VE concluded that all jobs existed in significant numbers in both the state and national economies. (R. 72, 74.)

## DISCUSSION

### I. Claimant's Credibility

Claimant contends that the ALJ improperly evaluated Claimant's credibility and, thus, his RFC. (Pl.'s Mem. at 1.) The undersigned disagrees.

In assessing a claimant's credibility, the ALJ must follow a two-step process. First, the ALJ must determine whether the claimant's medically determinable impairments could reasonably cause the alleged symptoms. *Craig*, 76 F.3d at 594–95. Next, the ALJ must evaluate the credibility of the claimant's statements regarding those symptoms. *Id.* at 595. The Social Security regulations require that an ALJ's decision "contain specific reasons for the finding on credibility, supported by the evidence in the case record, and . . . be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186, at *2 (eff. July 2, 1996).

In addition to the objective medical evidence, the ALJ must consider the following when assessing the intensity and persistence of a claimant's pain and other symptoms:

(1) Claimant's daily activities;

(2) The location, duration, frequency, and intensity of . . . pain or other symptoms;

(3) Precipitating and aggravating factors;

(4) The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate pain or other symptoms;

(5) Treatment, other than medication, received for relief of pain or other symptoms;

(6) Any measures used to relieve pain or other symptoms; and

(7) Other factors concerning functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); SSR 96-7p, 1996 WL 374186, at *3. "Factors [used] in evaluating the claimant's statements include consistency in the claimant's statements, medical evidence, medical treatment history, and the adjudicator's observations of the claimant." *Felton-Miller v. Astrue*, 459 Fed. App'x 226, 229 (4th Cir. 2011).

In this case, the ALJ first examined whether Claimant's medically determinable impairments could reasonably cause Claimant's symptoms and concluded that Claimant's impairments could produce such symptoms. (R. 13–14.) The ALJ then indicated inconsistencies between Claimant's allegations of disability and the evidence present in the medical record and Claimant's own testimony. (R. 14–15.) Claimant alleged he was unable to work due to limitations caused by his seizure disorder, a shoulder that repeatedly becomes dislocated, blindness in his left eye, Wolff-Parkinson-White syndrome, and headaches. (R. 13–14.) However, Claimant's asserted limitations are not consistent with the medical evidence of record or Claimant's own testimony.

9

As noted by the ALJ, the medical record and Claimant's testimony "reveal[] that the treatment has been essentially routine and/or conservative in nature, and has been generally successful in controlling those symptoms." (R. 14.) The medical records show that Claimant's seizures are well controlled with medication, as long as Claimant remembers to take it. (R. 14, 777–79.) Claimant further testified that his headaches are controlled by over-the-counter medications, and his Wolff-Parkinson-White syndrome is controlled by medication as well. (R. 41–42, 51.) Claimant's failure to take his seizure medication might be excusable were his noncompliance caused by his impairments. *See Watkins v. Astrue*, 414 Fed. App'x 894, 896 (8th Cir. 2011); Carolyn A. Kubitschek & Jon C. Dubin, *Social Security Disability Law and Procedure in Federal Court* § 2:5, at 94-95 (2014 ed.). However, that does not appear to be the situation in this case. Although Claimant forgets to take his medication at times, the medical evidence in this case indicates that Claimant is able to remember and follow simple instructions and that Claimant's memory is within the low average range. (R. 673-77.). Claimant was advised by Dr. Eric Hochstetler to establish a morning routine in order to help him remember to take his medication. (R. 688–89.) Thus, the evidence demonstrates that Claimant's impairments are controlled or controllable by the prescribed treatment regime and do not support the functional limitations asserted by Claimant.

The ALJ also noted that "office visit notes reflect significant gaps in the claimant's history treatment [sic] and relatively infrequent trips to the doctor for the allegedly disabling symptoms." (R. 14–15.) This, too, suggests that Claimant's symptoms are not as severe and persistent as claimed.

Based on his personal observations of Claimant at hearing, the ALJ found Claimant to be less than forthcoming:

> [A]lthough the claimant was reasonably articulate and appeared to be cognitively intact, he was a poor historian, repeatedly answering questions with "you could say that" and requiring prompting for details. The claimant's responses while testifying were evasive or vague at times, and left the impression that the claimant may have been less than entirely candid. This behavior may not have been the result of conscious intention to fabricate or to mislead. Nevertheless, it suggests that the information provided by the claimant generally may not be entirely reliable.

(R. 15.)

Finally, the medical records contain numerous instances where Claimant's doctors spoke to him about going back to school, participating in vocational rehabilitation, or finding a job. (R. 260–62, 384, 646–47, 674, 677, 718, 746, 777–79.) These discussions strongly suggest that Claimant's doctors do not view him as disabled. Claimant's reasons for not following through on plans to go to school or vocational rehabilitation appear related, in large part, to transportation issues and a general lack of interest on Claimant's part. (*See* R. 29.) Claimant testified that he did not think he could handle a full-time job. However, he further indicated that he is able to care for himself without assistance, plays video games and likes to draw. As the ALJ stated, "in view of the relatively weak medical evidence and other factors discussed" by the ALJ, it is difficult to attribute to Claimant's medical condition the limitations claimed. (R.15.)

Due to the inconsistencies among Claimant's statements and between Claimant's statements and the medical record concerning the degree of Claimant's limitations, the ALJ did not err in finding that Claimant's statements were not credible to the extent those statements were inconsistent with the RFC. The ALJ properly exercised his discretion in determining Claimant's credibility, and the ALJ's determination of Claimant's RFC is amply supported by the evidence of record.

11

**II. Treating Physician Evaluation**

Claimant made an additional argument that the ALJ erred in that he improperly failed to address Dr. Karla Thompson's conclusions resulting from her evaluation of Claimant. (Pl.'s Mem. at 10–11.) The undersigned disagrees.

"While the ALJ must evaluate all of the evidence in the case record, the ALJ is not required to comment in the decision on every piece of evidence in the record, and the ALJ's failure to discuss a specific piece of evidence is not an indication that the evidence was not considered." *Brewer v. Astrue*, No. 7:07-CV-24-FL, 2008 WL 4862185, at *3 (E.D.N.C. Oct. 21, 2008) (citing *Green v. Shalala*, 51 F.3d 94, 101 (7th Cir. 1995)); *see also Johnson v. Astrue*, No. 4:06-CV-0274-FL, 2008 WL 704321, at *2 (E.D.N.C. Mar. 14, 2008); *Best v. Astrue*, No. 5:06-CV-301-D, 2008 WL 64687 (E.D.N.C. Jan. 3, 2008). Though the ALJ did not directly cite Dr. Thompson's report, she did cite the records produced by the state medical consultants. (R. 16.) Both consultants specifically referenced Dr. Thompson's evaluation of Claimant. (R. 475, 494, 496.) Additionally, where Claimant states Dr. Thompson reported that Claimant had "exhibited persistent, significant impairment in his ability to alternate attention" (Pl.'s Mem. at 10), Dr. Thompson goes on to say, "I believe [Claimant] would be an excellent candidate for Vocational Rehabilitation. [Claimant] indicated that he would be willing to explore services available to him through [Vocational Rehabilitation] and accepted contact information for his local [Vocation Rehabilitation] office." (R. 677.) This reveals Dr. Thompson's opinion that Claimant is not disabled.

Furthermore, the ALJ provided non-exertional limitations within Claimant's RFC that address Claimant's poor ability to alternate his attention, as this is related to Claimant's limitations in concentration. The ALJ included such limitations as restricting Claimant to "simple, routine,

repetitive tasks at a non-production pace in a low-stress work setting requiring minimal social contact." (R. 13.) Thus, Claimant's mental limitations were adequately addressed, and the ALJ's failure to address Dr. Thompson's evaluation was not reversible error.

## CONCLUSION

For the reasons stated above, the undersigned RECOMMENDS that Claimant's Motion for Judgment on the Pleadings [DE #24] be DENIED, Defendant's Motion for Judgment on the Pleadings [DE #28] be GRANTED and the final decision of the Commissioner be AFFIRMED.

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who shall have fourteen (14) days from the date of service to file written objections. Failure to file timely, written objections shall bar an aggrieved party from receiving a de novo review by the District Judge on an issue covered in the Memorandum and Recommendation and, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions not objected to, and accepted by, the District Judge.

This 10th day of February 2014.

_____
KIMBERLY A. SWANK
United States Magistrate Judge